Good afternoon all. Our case for argument this morning, excuse me, this afternoon is United States v. Salazar-Rodriquez. Mr. Blagan. May it please the Court. In light of the Supreme Court's decision in Morrison v. National Australia Bank, this Court should reconsider its previous opinion in this matter under a different name, United States v. Leija Sanchez, on interlocutory appeal. Morrison starts out, the Morrison decision, starts out by making clear that the presumption against extraterritoriality applies to all statutes. It doesn't specifically say criminal statutes. Subsequent cases have applied. What did Morrison say about Bowman, the case on which our original decision relies? It does not mention Bowman. Right, and of course as we said in the original decision, we're bound by Supreme Court decisions until the Supreme Court itself decides to overrule them. If it thinks Morrison is inconsistent with Bowman, now it's free to overrule Bowman, but we're not supposed to anticipate the overruling of a Supreme Court case. Understood, and I understand we're whistling in the wind about overruling Bowman. There is a very good argument to be made, however, that post-Morrison, Bowman should be viewed far less broadly than this Court did. Bowman does not apply to all criminal cases, as the Leija Sanchez opinion acknowledges, but it only applies to a certain type of criminal case by its own words. This is what Bowman says about the kind of criminal cases that it applies to. I'm well aware that you disagree with the panel's opinion, but generally the law of the case prevents just going back and saying we misread Bowman. Well, but Your Honor, with all due respect, I don't think the opinion relied solely on Bowman, and here's, I'll tell you the specific portions that I think are unrelated to Bowman, but which are contradicted by Morrison. For example, the first point is that the Leija Sanchez opinion indicates that extraterritorial application can be found by pointing to the fact that 18 U.S.C. 1959, Violent Crimes in Aid of Racketeering, affects, as established by the Supreme Court, the criminal case of Bowman. This is a statute that indicates that it affects foreign commerce, and the indictment here alleged that the enterprise was an international one. Morrison explicitly rejects those arguments. It says that a reference to foreign commerce cannot serve as a basis for extraterritorial application. It's at page 263 of the Morrison opinion. And Morrison also makes clear that what is required to determine whether the presumption applies or not is a statutory analysis, not an analysis of the individual facts of a case. That can come in a separate circumstance, which I'll talk about in a moment. But Morrison makes clear that it's a statutory analysis and that the government cannot plead a case into extraterritorial reach simply by what it alleges in the indictment. The second significant... Counsel, what do you think about the Second Circuit's opinion in RJR and European Community against RJR and Abisko? Judge, if I'm... I've read a lot of cases on this, and if that's the one that... It's the one in which certiorari was granted this morning, so I'm interested in what you think about the Second Circuit's views. I checked last night and it had been docketed, the petition had been docketed... It was granted this morning. I guess I should have checked again. European Community versus RJR and Abisko actually supports our case that this statute would not be applied extraterritorially because European Community held... applies extraterritorially to foreign countries if and only if the relevant RICO predicate is extraterritorial. Here, we're not really talking about a RICO predicate, we're talking about a violent crime in aid of racketeering. But if you want to consider that as a predicate... The reason I ask is that RJR and Abisko is civil. Yes. And the Second Circuit seems to say that it's not going to read Morrison any broader than the facts of Morrison. Now, that may be wrong. There were, of course, five dissents from the denial of rehearing en banc in RJR and Abisko. I bet that interested the Supreme Court. Sure it did. The Second Circuit has also said, however, that Morrison specifically applies to a criminal violation of 10b of the Securities Act, which is what Morrison was about in the first place. It essentially says it does apply to criminal cases. But what European Community says is that RICO applies extraterritorially only if the predicate is extraterritorial. And here, if you want to consider murder the predicate, murder is not extraterritorial. Even Bowman says that. It specifically says not extraterritorial. Here, however, is the primary conflict between Morrison and this court's opinion, Leija Sanchez. This court relied on significant conduct in the United States and significant benefits that were reaped in the United States. Morrison says you can't rely on that. That does not trump the presumption against extraterritoriality. What Morrison does say is that when there is some conduct, which is in the United States, which they say is inevitable in virtually every case that's going to get charged here, that the presumption is not a craven watchdog who retreats just because there's some domestic conduct. What it says is you have to examine what is the focus of congressional concern when enacting the statute. And if that's what the law is, this court has not yet determined what the focus of congressional concern is regarding violent crimes in aid of racketeering. Does it matter, counsel, that at least in my view the victim of the underlying RICO conspiracy here is the United States government as it was in Bowman? No. And the reason is because we're talking about statutory construction. Lots of cases can target the United States depending on what the statute is. In fact, one of the cases I read that the name is escaping me was a district court case in California where it was wire fraud and the fraud targeted the United States, but the district court said, well, that doesn't make it extraterritorial because it's a statute we're talking about. Bowman talks about criminal statutes that are designed to protect the United States from attacks on itself. That's the purpose. And they cite things like bribing a member of a council guy in a foreign country or stealing arms or munitions from the United States government. That is a statute designed to protect the United States. There's a difference between a statute protecting the United States and a general statute which is used to impact the United States. And that's what we have here. Arguably, well, more than arguably, there would be the racketeering conspiracy was selling fake United States documents. So someone could certainly claim that the facts here support an attack on the United States, but that's not statutory construction. Counsel, your time is running, and you might want to devote some attention to the arguments that we haven't already rejected. All right. Well, I have one. This argument on extraterritoriality applies even greater, and it hasn't been decided by the court yet, to the special verdicts for the racketeering conspiracy because one of the things the jury had to find to. I was hoping this would get you to turn to the Section 956 argument. There's another counsel who's going to argue that, so I am not prepared to argue. What I will say at the end, though, is.  You haven't heard this argument either, Your Honor. One of the things that happened in this case is the government disavowed its expert's opinion in rebuttal argument, and you're going to turn criminal cases and civil cases on their ear if parties are not allowed to rely on people saying, this is what our expert is going to say, eliciting that testimony from the expert, and then in rebuttal deciding they don't like it and disavowing it. That can't happen. Otherwise, the expert rules go out the window. How do we know and how do we obtain an expert to say something contrary to what the other side's expert is already going to say? Is it correct that the expert who testified, the Mexican doctor who examined the victim, said that one bullet could cause more than one entrance wound? He did, and in fact, he found a bullet that caused more than one entrance wound and looked to see if the other ones did the same thing and concluded that they did not. That's the issue. He said, I found a pass-through. The government just decided to say, well, there must have been more than one pass-through, even though he specifically considered that, and that was particularly aggravating at the trial. I see that I'm into my rebuttal, and I'll reserve what's left. All right. Thank you, Mr. Blagan. Mr. Morris? May it please the Court. I represent Gerardo Salazar Rodriguez. His conviction and that of Manuel Leija under 18 U.S.C. 956 must be set aside because it was plain error not to instruct the jury that this statute requires the defendant to be, quote, within the jurisdiction of the United States. There's never been a case that we have found where the defendant wasn't within the jurisdiction of the United States, and the government hasn't cited any. There's two circuit courts that specifically say that. That's what the statute means. The United States relies on Ford against the United States, and I'm hoping that you will discuss that. Ford addresses the general conspiracy statute and involves a crime within the United States and addresses the jurisdiction over a co-conspirator outside the United States for a crime committed within the United States or against the United States. This statute, 956, is very different. It involves, from its title on, crimes in foreign countries. And so here the facts are undisputed that a Mexican national, my client Salazar, killed a Mexican in Mexico. And the question is whether this statutory allowance of that sort of extraterritorial reach is proper. And it is and was for Julio, the defendant that Mr. Blagan represents, and he has not raised any issue about this statute. He doesn't make this argument. The instruction is clearly wrong in its fourth element, which the instructions are at page 30 of the government's brief. The fourth instruction that was given without objection, I concede, was that at least one of the conspirators must be within the jurisdiction of the United States. Now, first of all, that instruction clearly is talking about territorial jurisdiction. The jury wouldn't understand it to mean anything other than the physical. That's, I assume, part of the question, whether the reference to jurisdiction of the United States means the law prescribing jurisdiction of the United States versus the physical jurisdiction. Or presumably there's another reading which would have that mean all the 50 states plus Puerto Rico, Guam, America, and Samoa, and all the other territories. And we need to pick one of these three to the extent the issue has been preserved. I agree, Judge. And, in fact, I looked at the definitional section. The last time I was here I failed to look at the Dictionary Act. 18 U.S.C. Section 5 says United States means, as you just recited, certain other territories. And that United States means that when it's used in a territorial sense. That's the language of the statute. So I looked in Title 18 at every place that within the jurisdiction of the United States appears. And there's approximately a dozen statutes where that very same phrase appears. And in every example it involves territorial jurisdiction. It's speaking of location. And this entire statute, 956, is all about location. It has about four or five different references to whether you're in or out of the United States. So I think it's pretty clear that it is a reference to the presence of the defendant in the United States. And every case that we have found, and cases in the Ninth Circuit, specifically say that at least one of the conspirators was within the jurisdiction of the United States. I'm sorry. Sorry, let me find that. Mahena, cited in our brief at pages 11 and 12 of the reply, says, conspiring in the United States is an element of the offense. It uses that language. And Chun, in the Ninth Circuit, says, within the borders of the United States, clearly making a reference to the physical location. So there doesn't appear to be any law that suggests that 956 permits a prosecution of someone who doesn't conspire within the United States. Counsel, could you remind me what the sentence was on the 956A1 charges? They were 20 years. Where am I on my time? Have I used up my two minutes? I'm sorry. You, of course, can answer, Judge Hamilton. It was 20 years for each defendant. Okay. But it could have been life? That is correct. Okay. Thank you. I'll reserve whatever time I have. Thank you. Thank you, Mr. Morris. Ms. Nassar. May it please the Court. With regard to the defendant's first argument regarding Count 3, the murder in aid of racketeering, this panel is correct that the same exact issue was already decided by this Court in this case. The only thing that has essentially changed is the Morrison case, but the defense is over-reading Morrison. Morrison addressed a section of the Securities and Exchange Act, not RICO. In a civil case, it did not even mention Bowman. Bowman was not even mentioned in the briefs, and it did not expressly overrule Bowman. As this Court has already stated in the Leija Sanchez case, civil decisions cannot implicitly overrule a decision holding that criminal statutes are applied differently. What do we do with the fact that both of those statutes are both civil and criminal, though? Do they have different reaches depending on whether it's a private civil case, a government civil case, or a government criminal prosecution? Are you referring to Section 10B of the Securities and Exchange Act? Yes, as well as the civil RICO. There are cases that have read Morrison to extend to criminal interpretation of 10B. However, those cases are limited only to Section 10B, and regardless of whether it's interpreted to apply to the criminal sphere in 10B, Morrison does not change this panel's position on the racketeering statute. Well, distinguish them for me, please. Here, even if Morrison would apply, even if the presumption would apply to a criminal case, in this case we're not talking about just any criminal statute. We are talking about RICO, which is so obviously a statute that covers overseas conduct. And the VICAR and the racketeering statutes were enacted to address large-scale international organizations with tentacles across the world, organized crime, mafia, terrorism, cybercrime. And here, especially, looking, again, to the language and function of the statute, this case there was a victim. The United States was a victim of the racketeering organization. So can you direct us to the textual indications of that extraterritoriality? The textual of 19- Of RICO. Well, I believe that here- It includes, I mean, 10B-5, or 10B, if I recall, can be a predicate act. Maybe I'm wrong. Maybe it just was wire and mail fraud. I'm not sure about 10B being a predicate act. But under Bowman, you were to look at the language and function of the statute, which is exactly what this court did in the original interlocutory appeal in Leija-Sanchez. Bowman is the exception that this court relied upon. And, again, this court has said that even if there are cases that are in tension with Bowman, it must continue to apply Bowman until the justices themselves overrule it. So in this case, Bowman remains good law. This panel's opinion remains good law. And the district court correctly considered itself bound. Well, I don't know whether it's good law. Maybe the justices are going to say that it's not. Counsel, could I ask you, 1959A requires an act, attempt, or threat to commit a crime of violence against any individual in violation of the laws of any state or the United States. How do you address that element here? The murder that took place in Mexico was in violation of the state of Illinois. Looking to the Illinois long-arm statute, which is 720 ILCS 5-1-5, the murder here was squarely within the Illinois long-arm statute. The Illinois long-arm statute contemplates jurisdiction. It's very broad. It contemplates jurisdiction for an offense that is committed either within or outside the state of Illinois, and it includes conduct that is within the state, which constitutes an attempt, solicitation, or conspiracy to commit in another jurisdiction, here Mexico, an offense under the laws of both this state and that other jurisdiction. Here the plan was hatched in Illinois. There were phone calls. There was payment in furtherance. And that made the murder squarely within the Illinois long-arm statute. We have no Illinois case like that, though, do we? I have not found an Illinois case, but I don't think that's surprising, because I think it's very unusual, first of all, and we did articulate this in our first brief in the interlocutory appeal that we incorporated by reference, but this was a very unusual case. The conspiracy to murder was captured on wiretap, and I think that it would be a rare case that that would happen, and also where the state of Illinois would have the funds to go after something like that. With regard to the third argument, the district court properly denied the defendant's motion for a new trial based on the government's rebuttal argument. Time is short. I'd like you to address Section 956. Your argument, as I understand it, is that the reference to jurisdiction of the United States means to the regulatory jurisdiction of the United States, to any transaction over which the United States can prescribe a legal requirement. My question for you is, doesn't that pretty much read those words out of the statute? Because every statute applies only where the United States can supply the rule of decision. In your view, what do those words add to the fact that if the United States doesn't have any regulatory competence, it doesn't have any regulatory competence? I think that there are three options here with the language of the statute. The first would be that... I wish you'd answer my question, and then you can tell me what other options we have. I think that by saying that it is within the jurisdiction of the United States, that is different from saying it is within the United States, which is what the other surrounding statutes say. No, I wish you would answer my question, which is, in the view of the United States, does that phrase have any legal effect at all? It does, because there has to be some connection to the United States that would bring it within the jurisdiction of the United States. That is true whether that phrase is in the statute or not. Every federal statute is applicable only when the United States has regulatory jurisdiction. That's the premise of my question. What, in your view, does this phrase add? I think that it adds a distinction from the statutes around it, which is whoever within the United States, and I think it reiterates the fact that it cannot wrap in somebody who conspires with no connection to the United States to commit a murder. So it doesn't add anything. It just says this statute doesn't apply where without this language it wouldn't apply. Perhaps it's redundant, Your Honor, but I think it makes a difference in comparison to the other statutes that are in the same series as it is. Here, regardless, the defendants waived this argument about the jury instructions because they approved the argument at issue. They were aware they could make an objection, and they purposefully decided not to do so. The defense is unable to point to any case supporting their assertion that the defendant himself must be within the physical territory of the United States when the agreement was made. They have no cases for that argument, and for that reason the district court did not plainly err. Here, under the general conspiracy law, this statute, the crime does come underneath the ambit of the statute. There are no other questions on that issue. Turning to the third argument about the government's rebuttal, here the government's rebuttal was properly based on the trial evidence. In addition, what is not mentioned by the defense attorney here, the argument was that the court's curative instruction alleviated any prejudice of the defendants, and the defendants were not denied a fair trial. Contrary to the defendant's assertion, the government did not disclose Dr. Navarro as an expert on the number of bullets that were used in this murder, and the government did not even elicit testimony regarding the exact number of bullets. He offered that testimony up. In response, the government's argument about the number of times the victim was shot was based on the record citing exhibit numbers, which contained contradictory evidence which supported the government's theory that 15 bullets were used, and the government gave a curative instruction that said not only that an attorney's arguments were not evidence, but in fact directed the jury that the only medical evidence presented reflected that the victim was shot 21 times. Counsel, was this discrepancy between 15 bullets in the magazine and 21 apparent wounds a surprise to anybody at trial? I think it should not have been a surprise at trial. Was it a surprise to you? No, it was not. The doctor had a report which the government provided which detailed his opinion. There was also the criminalist's report and all the photographs showing the ballistics that supported the government's argument that 15 bullets were used, and then there were repeated phone calls over and over again from the defendant, Salazar Rodriguez, that he had shot the victim 15 times, so that discrepancy should have been apparent. If there are no further questions, then the government asks that this court affirm the convictions and sentences of the defendants. Thank you, Ms. Nelson. Mr. Blyton. With all due respect to the government, they specifically elicited from their expert how many times the victim was shot. I cited it in our brief at page 48. The prosecutor asked the questions, does that mean there were 22 different firearm projectiles? Answer, no, only 21. Why did you conclude that? And then he goes on to explain that there were through and throughs. That was specifically elicited by the government. I agree there was no surprise that the coroner was going to say he was shot 21 times because that's what he said in the expert report that was tendered to us. And if I can indulge your honors, it would take me an hour to explain why the argument that there were 15 bullets is factually incorrect, but it's in the brief at page 54 and 55. It is absolutely factually incorrect and is contradicted by their own witnesses. They're double-counting holes. They're counting fragments and separate bullets as two bullets. It is a completely convoluted and non-factual argument. Mr. Blyton, how could that affect the outcome of that? Because despite what the court might think, because a guy admitted to doing the killing on the phone, the evidence on that issue of whether he actually did kill him was closely balanced. The man was a liar. He said, I'm in range of a person. I'm going to kill him for you, a different guy. I see him. I got within a few yards of him. I saw him face-to-face. He's a liar. The guy he's talking about was in custody in the MCC in Chicago. He's clearly lying. Other forensic evidence did not match. He said, I shot him with hollow-point bullets, at least three, I think. No evidence of hollow-point bullets or hollow-point bullet wounds. He also said, I'm surveilling the guy's house right now at a time where a government witness said that Julio, my client's wife and kids, had gone back and forth, and so had the person he was chasing, the person he was supposed to be killing. He was clearly lying to the people in Chicago in order to get money. And on that issue, despite what you might think by the fact that the guy said he did it, it was actually closely balanced, and that's how it affected the trial, and that's why the government made their argument. Let me understand. All that you have just said came out. Correct. Right? Yes. So you're saying the six-shot difference would be the tilt? That was the critical one because he said, I know exactly how many times I shot him. Obviously not in those words. I had a clip with 15 bullets in it. I emptied it. I had forgotten about the clip. Yeah, but why don't we think that that's the lie?  Why wouldn't one think that that is the lie? Well, that's what I expected the government to argue, but the problem was the coroner says the man was shot 21 times. Yeah, exactly. Right. It's easy to be shot 21 times if you're lying about whether you've got 15 bullets in the clip. Correct, but what the government can't do is disclose an expert and then disavow him at the last minute. But come back to Judge Flom's question. What difference does 15 shots versus 21 shots versus 22 shots? This case is about whether somebody was deliberately shot and killed, not how many times he was shot. No, it wasn't about that, Judge. Everybody knew he was deliberately shot and killed. It was about who did it. So the defense theory is that after the defendants made all these arrangements for the murder that an unknown mystery shooter happened to show up as the defendant's shooter was approaching? Not as he was approaching, but the evidence was from a government witness that cab driving, especially I think he was an unlicensed cab driver or something in Mexico, is an extremely dangerous occupation. And this is one of the reasons why we, again, shouldn't be prosecuting crimes from foreign countries. There were police reports of guys saying that it happened completely different from how this chaplain says he did it. But, of course, for some reason in Mexico, they don't write down the names of people who give statements to the police. We had a police report with no names. We sent an investigator to Mexico to try to find them. He couldn't find those people. We ended up working out some sort of half stipulation to get the evidence in, but that really underlies the problems of why you shouldn't be prosecuting crimes from foreign countries. How are we supposed to investigate a crime in Mexico? How are we supposed to get the people when they don't follow the same sort of police procedures that we do? I see that I'm in the red, but it's yet another reason for this court to reverse count three and tell the government you can't disavow your expert in rebuttal because it takes away our opportunity to get our own expert to testify to that answer. Thank you. Mr. Morgan. Mr. Morris. We made the argument in our reply brief that reading within the jurisdiction of the United States as a regulatory statement of the scope of criminal powers made it a meaningless and unnecessary phrase. And so I agree with the court's view of that. This is such an easy issue. How come everybody missed it? I think the reason is, to come to my second point, that there is case law, all the case law has read the statute the same way, every case. And there's one I didn't put in the brief, but if I may, I'll mention the Fourth Circuit in Hassan 742 Federal 3rd 104. Every appellate case and every district court case, the defendants in the United States, he fits the charge as it's stated in the statute. Has this issue arisen before? No. I don't believe so. We haven't found it. So I guess why should we treat it as plain error when nobody picked it up in the district court? It's never been litigated before. Because it's so flatly inconsistent with an element of a murder statute that not to deal with it would be a substantial disruption of justice. These men are being convicted of a crime they didn't commit. It's the worst kind of error. It's plain and it's substantial. And no one would ever waive such a requirement. It's true it was overlooked, but I think it's because that's the way it worked. These statutes were for terrorism. Many of the cases involved jihadists in the United States conspiring to arrange for violence overseas. And one of the cases we cite, Chun, is an effort by a man to overthrow the government of Cambodia, a friendly country at the time. And so it's always someone in the United States within the jurisdiction of the United States. So I think it's the plainest of errors. Thank you. I see my red light. Thanks to all counsel. Mr. Morris and Ms. Blagan, you were appointed in this case. You have the additional thanks to the court for accepting this appointment. All right. The case is taken under advisement and the court will stand in recess.